POMERANTZ LLP
Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

*Attorney for Plaintiff*

*[Additional Counsel on Signature Page]*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ISAAC POTVIN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>GERON CORPORATION, JOHN A. SCARLETT, ANDREW J. GRETHLEIN, MICHELLE J. ROBERTSON, FAYE FELLER, ANIL KAPUR, and  JIM ZIEGLER,<br><br>Defendants. | Case No.<br><br>CLASS ACTION<br><br>COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>DEMAND FOR JURY TRIAL |

Plaintiff Isaac Potvin ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Geron Corporation ("Geron" or the "Company"), analysts' reports

and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired Geron securities between February 28, 2024 and February 25, 2025, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     Geron, a late-stage clinical biopharmaceutical company, focuses on the development and commercialization of therapeutics for the treatment of cancer and chronic degenerative diseases. The Company's sole product candidate is RYTELO (imetelstat), a telomerase inhibitor designed to prevent the uncontrolled proliferation of malignant stem and progenitor cells in myeloid hematologic malignancies for the treatment of low- to intermediate-1 risk myelodysplastic syndromes ("lower-risk MDS") and intermediate-2 or high-risk myelofibrosis. Geron categorizes treatment eligible patients with lower-risk MDS into three groups: (1) first-line patients ineligible for erythropoiesis-stimulating agents ("ESAs"); (2) second-line ESA relapsed/refractory patients; and (3) third-line plus ESA relapsed/refractory patients.

3.     According to Geron, "[l]ower-risk MDS is a progressive blood cancer with high unmet need, where many patients with anemia become dependent on red blood cell transfusions, which can be associated with clinical consequences and decreased quality of life." At all relevant

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

times, the Company has touted itself as being "in a strong position for value creation" based on its "differentiated product candidate," the "potential for significant commercial opportunities in transfusion-dependent, lower-risk MDS," and the "excellence and experience of [its] employees."

4.     In June 2024, Geron commercially launched RYTELO following its approval by the U.S. Food and Drug Administration ("FDA") for the treatment of adult patients with lower-risk MDS with transfusion-dependent anemia requiring four or more red blood cell units over eight weeks who have not responded to or have lost response to or are ineligible for ESAs.  In a press release announcing the drug's FDA approval, Geron stated that it "believe[s] eligible patients with lower-risk MDS can potentially experience meaningful clinical benefit" from RYTELO and that "[t]he approval of RYTELO as the first telomerase inhibitor is a testament to the power of [its] science and the passion of [its] people to innovate in the field of blood cancer." Further, under the heading "important safety information," the press release provided that patients taking RYTELO would need to be monitored "weekly for the first two cycles, prior to each cycle thereafter, and as clinically indicated."  However, Geron has described this ongoing monitoring requirement as 'standard' and has stated that neither community nor academic facilities consider such monitoring requirements to be a burden.

5.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) despite contrary representations to investors, a lack of awareness of RYTELO among health care providers, the weekly monitoring requirement, and seasonality and existing competition would impair Geron's ability to capitalize on the purportedly significant unmet need for the drug; (ii) accordingly, the RYTELO launch was unlikely to be as profitable as the Company had led investors to believe; (iii) as a result, Geron's business and/or financial prospects were overstated;

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1    and (iv) as a result, the Company's public statements were materially false and misleading at all

2    relevant times.

3        6.    On February 26, 2025, Geron announced its financial results for Q4 and full year

4    2024.  Specifically, Geron reported Q4 2024 earnings per share ("EPS") of -$0.04 and revenue of

5    $47.54 million, falling far short of the -$0.02 to -$0.03 EPS and $61.93 revenue million figures

6    projected by analysts.

7        7.    That same day, Geron hosted an earnings call with investors and analysts to discuss

8    the Company's Q4 and full year 2024 results (the "Q4 2024 Earnings Call"), during which

9    Geron's Chief Executive Officer ("CEO") Defendant John A. Scarlett ("Scarlett") revealed that

10   the Company had "observed flat revenue trends over the last few months" for RYTELO.  The

11   Company attributed this diminished growth to seasonality, competition, lack of awareness among

12   health care providers, and the burden of the weekly monitoring requirement.  Further, Geron's

13   Executive Vice President ("V.P.") and Chief Commercial Officer ("CCO") Defendant Jim Ziegler

14   ("Ziegler") stated that, in response to the foregoing, the Company was "assessing other possible

15   root causes for the flat revenue trends" and considering strategic adjustments to invigorate growth,

16   including "increasing [health care provider ("HCP")] awareness" of RYTELO.

17       8.    Market analysts were quick to comment on Geron's disappointing Q4 2024 results

18   and emphasize the Company's failure to effectively market and commercialize RYTELO.  For

19   example, on February 26, 2025, the investment bank H.C. Wainwright & Co ("H.C. Wainwright")

20   downgraded the stock from buy to neutral, stating "[f]lat revenue trend leads Geron to rethink

21   launch strategy; we expect it may take time to build footing."  Further, H.C. Wainwright noted

22   that the majority of prescriptions remain in the academic setting and highlighted the lack of first-

23   line new patient starts, naming competition as a likely factor.  Similarly, Barclays lowered its

4

price target 56%, citing RYTELO's new patient start flatness, the impact of seasonality on sales, "hesitancy around starting products that require monitoring," and competitive dynamics.

9.      On this news, Geron's stock price fell $0.76 per share, or 32.06%, to close at $1.61 per share on February 26, 2025.

10.      As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

11.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

12.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

13.      Venue is proper in this District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Geron is headquartered in this District, Defendants conduct business in this District, and a significant portion of Defendants' activities took place within this District.

14.      In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

1

## **PARTIES**

2

15.     Plaintiff, as set forth in the attached Certification, acquired Geron securities at

3

artificially inflated prices during the Class Period and was damaged upon the revelation of the

4

alleged corrective disclosures.

5

16.     Defendant Geron is a Delaware corporation with principal executive offices

6

located at 919 East Hillsdale Blvd., Suite 250, Foster City, CA 94404.  The Company's common

7

stock trades in an efficient market on the Nasdaq Global Select Market ("NASDAQ") under the

8

9

ticker symbol "GERN."

10

17.     Defendant Scarlett has served as Geron's CEO at all relevant times.

11

18.     Defendant Andrew J. Grethlein ("Grethlein") has served as Geron's Executive

12

V.P. and Chief Operating Officer at all relevant times.

13

14

19.     Defendant Michelle J. Robertson ("Robertson") has served as Geron's Chief

15

Financial Officer at all relevant times.

16

20.     Defendant Faye Feller ("Feller") has served as Geron's Executive V.P. and Chief

17

Medical Officer at all relevant times.

18

21.     Defendant Anil Kapur ("Kapur") served as Geron's CCO from prior to the start of

19

the Class Period until August 2024.

20

21

22.     Defendant Ziegler has served as Geron's Executive V.P. and CCO since

22

September 2024.

23

23.     Defendants Scarlett, Grethlein, Robertson, Feller, Kapur, and Ziegler are

24

collectively referred to herein as the "Individual Defendants."

25

24.     The Individual Defendants possessed the power and authority to control the

26

contents of Geron's SEC filings, press releases, and other market communications.  The

27

Individual Defendants were provided with copies of Geron's SEC filings and press releases

28

6

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with Geron, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

25. Geron and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

26. Geron, a late-stage clinical biopharmaceutical company, focuses on the development and commercialization of therapeutics for the treatment of cancer and chronic degenerative diseases. The Company's sole product candidate is RYTELO (imetelstat), a telomerase inhibitor designed to prevent the uncontrolled proliferation of malignant stem and progenitor cells in myeloid hematologic malignancies for the treatment of lower-risk MDS and intermediate-2 or high-risk myelofibrosis. Geron categorizes treatment eligible patients with lower-risk MDS into three groups: (1) first-line patients ineligible for ESAs; (2) second-line ESA relapsed/refractory patients; and (3) third-line plus ESA relapsed/refractory patients.

27. According to Geron, "[l]ower-risk MDS is a progressive blood cancer with high unmet need, where many patients with anemia become dependent on red blood cell transfusions, which can be associated with clinical consequences and decreased quality of life." At all relevant times, the Company has touted itself as being "in a strong position for value creation" based on

7

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

its "differentiated product candidate," the "potential for significant commercial opportunities in transfusion-dependent, lower-risk MDS," and the "excellence and experience of [its] employees."

**Materially False and Misleading Statements Issued During the Class Period**

28.     The Class Period begins on February 28, 2024, when Geron filed an Annual Report on Form 10-K with the SEC, reporting the Company's financial and operational results for the year ended December 31, 2023 (the "2023 10-K").  In providing an overview of the Company's commercial plans for RYTELO, the 2023 10-K stated, in relevant part:

> If imetelstat is approved in lower-risk MDS for marketing by regulatory authorities, we plan to commercialize imetelstat ourselves in the U.S. **Our U.S. launch strategy is designed to prepare imetelstat, the market and the company to ensure broad reimbursement and deliver a seamless customer experience to all stakeholders at launch. Several long-lead time activities have already been completed, such as securing a global trademark for the imetelstat brand name; finalizing third party logistics, our distribution network, and our patient support providers; and onboarding highly experienced commercial and medical affairs leadership teams. We continue to conduct pre-commercial preparations for the U.S., such as enhancing and/or establishing company processes and systems to support a potential commercial launch, refining our market research in lower-risk MDS, engaging in marketing and commercial access/reimbursement preparatory efforts, and hiring our sales force, which we expect to occur in the first and second quarters of 2024.  We continue to evaluate our strategy for the potential launch and commercialization of imetelstat in Europe.** Based on our internal estimates of pricing and addressable patient populations in 2031 and if regulatory authorities approve imetelstat for marketing in lower-risk MDS and relapsed/refractory MF, we believe the potential combined total addressable market opportunity in the U.S. and Europe for imetelstat is approximately $7.0 billion, of which lower-risk MDS represents approximately $3.5 billion and relapsed/refractory MF represents approximately $3.5 billion.[1]

29.     Appended to the 2023 10-K as exhibits were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 by Defendant Scarlett and Robertson, attesting that "the information contained in the [2023 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

---

[1] All emphases included herein are added unless otherwise indicated.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

30.     That same day, Geron issued a press release announcing the Company's Q4 and full year 2023 financial results. The press release stated, in relevant part:

> "Geron's progress and execution throughout 2023 has paved the way for a potentially transformational 2024, as we plan for the transition to becoming a commercial company," said [Defendant] Scarlett[.] "***We believe that we are in a strong position for value creation, based on our differentiated product candidate, the potential for significant commercial opportunities in transfusion-dependent, lower-risk MDS and relapsed/refractory MF, the excellence and experience of our employees, and the strength of our balance sheet to support a potential U.S. launch***."

31.     Also on February 28, 2024, Geron hosted an earnings call with investors and analysts to discuss the Company's Q4 2023 results (the "Q4 2023 Earnings Call"). During the scripted portion of the Q4 2023 Earnings Call, Defendant Scarlett stated, in relevant part:

> [W]e ended 2023 with a strong cash position of approximately $378 million, which based on our current plans and expected available resources, we expect will enable us to fund a potential successful launch in transfusion dependent low risk MDS in the US and fund our planned operations into the third quarter of 2025.
>
> ***We believe our differentiated product candidates, the very important commercial opportunities in transfusion dependent low risk MDS and relapse/refractory MF, the excellence and experience of our employees, and the financial resources to execute on our near-term milestones, puts us in a strong position for value creation***.

32.     Also during the scripted portion of the Q4 2023 Earnings Call, Defendant Kapur stated, in relevant part:

> Approximately 10% of lower risk MDS patients are not eligible for ESAs and represent a very high unmet need subgroup. RS-negative patients make up approximately 75% of lower risk MDS patients and are a population particularly vulnerable to poor clinical outcomes. There are no therapies indicated for the treatment of anemia in RS negative patients once they are relapsed or refractory to ESAs. RS positive patients make up approximately 25% of the lower-risk MDS patients, and most who are high-transfusion burden lack effective treatment options. These underserved subgroups are at a greater risk for disease progression and suboptimal survival and are in the need for more effective treatment options.
>
> Moving on to an update on US launch preparations, with our PDUFA date just about 3.5 months away, we have completed multiple critical launch readiness activities and plan to be ready to launch imetelstat in the US market upon potential approval. Long lead time activities such as securing our global trademark on our

brand name, manufacturing of commercial supply are now complete. In preparation of launch, we have also finalized our distribution network and our patient support providers. In addition, we have onboarded and fully integrated a highly experienced commercial and medical affairs team into Geron. We continue to transition Geron towards a commercial company with the integration and adoption of systems and processes to recognize and report revenues and the continued refinement of engagement plans with marketing, commercial access, payer and reimbursement stakeholders.

33.    On March 14, 2024, Geron issued a press release entitled "Geron Announces FDA Oncologic Drugs Advisory Committee Votes in Favor of the Clinical Benefit/Risk Profile of Imetelstat for the Treatment of Transfusion-Dependent Anemia in Patients with Lower-Risk MDS." The press release stated, in relevant part:

> "We are pleased with the Committee's decision to recognize the positive clinical benefit/risk profile of imetelstat for the treatment of transfusion-dependent anemia in adult patients with lower-risk MDS. There are few treatment options and significant unmet medical need remains for these patients, particularly among those with difficult-to-treat subtypes of this blood cancer," said [Defendant] Feller[.] "*We believe that imetelstat has the potential to be an important new medicine for patients* and look forward to continuing our collaboration with the FDA as they complete their review of our New Drug Application."

34.    On May 2, 2024, Geron issued a press release announcing the Company's Q1 2024 financial results. The press release stated, in relevant part:

> "Since the FDA ODAC's 12 to 2 vote in favor of the clinical benefit/risk profile of imetelstat for the treatment of transfusion-dependent anemia in patients with lower-risk MDS in March, we have continued working with the FDA as they complete their review of our New Drug Application, which has a June 16, 2024 PDUFA target action date," said [Defendant] Scarlett[.] "*We are actively preparing for a successful launch of imetelstat in the U.S., if approved, including most recently onboarding our sales force last month, refining our market research and completing buildout of our enterprise capabilities and systems to support our transition from a clinical to commercial-stage company*."

> U.S. Commercial Preparation

> Geron has now completed onboarding its commercial team, with the buildout of the full sales organization in April. *Other commercial preparations for the U.S. are ongoing and on target, including enhancing and/or establishing company processes and systems to support an expected commercial launch, refining market research in TD LR-MDS, and engaging in marketing, commercial access, payer, and reimbursement preparatory efforts*.

35.    That same day, Geron hosted an earnings call with investors and analysts to discuss the Company's Q1 2024 results (the "Q1 2024 Earnings Call").  During the scripted portion of the Q1 2024 Earnings Call, Defendant Scarlett stated, in relevant part:

We're poised for a successful U.S. launch of Imetelstat for the treatment of transfusion-dependent anemia in patients with lower risk MDS. If approved we're deeply excited for the opportunity to bring patients what we believe is an important and differentiated medicine. With our PDUFA date on June 16th, we continue to work closely with the FDA as they complete the review of our new drug application.

\*\*\*

In short, we're building on our momentum acting with urgency and fully confident in our readiness for U.S. launch on potential approval. We're also financially well-resourced to support the planned U.S. commercial launch with approximately $465 million on the balance sheet as of March 31 of this year. On the heels of the highly positive ODAC outcome, we raised approximately $141 million in net proceeds from an underwritten public offering of common stock and a pre-funded warrant.

36.    Also during the scripted portion of the Q1 2024 Earnings Call, Defendant Kapur stated, in relevant part:

*We believe that we are positioned very well for commercial value creation and are well-prepared to execute a successful U.S. launch upon potential approval.* As [Defendant Scarlett] mentioned in April, we completed the build-out of our full commercial organization with the hiring of our sales force, which is being now integrated and trained so that they will be prepared to be deployed in the field upon potential approval.

\*\*\*

*To support our launch preparation and commercial strategy, we have collected extensive market insights which suggest that Imetelstat is highly differentiated in this transfusion-dependent low-risk MDS market. Our research has shown that medical and payer stakeholders are dissatisfied with available options in the low-risk MDS space which we believe creates an opportunity for Imetelstat.*

\*\*\*

We expect to see Imetelstat uptake across ESA ineligible, ESA failed, RS negative, and RS positive high transfusion burden patients. Based on our latest 2024 market research of 50 U.S.-based practicing hematologists across both community and academic settings, on the left-hand side of the slide, you can see that our market

11

research suggests meaningful Imetelstat use in frontline ESA ineligible patients, especially those who are RS negative.

\*\*\*

***We believe we are well-positioned to capitalize on Imetelstat opportunity in transfusion-dependent low-risk MDS by building on the unique product profile and executing on the launch critical success factors that are driving our commercial plan***. From a prescriber's perspective, we have a few important goals that prescribers embrace the totality of clinical benefit achievable with Imetelstat and understand the efficacy profiles across MDS subgroups, including RS negative and high-transfusion burden patients.

37.　　On June 6, 2024, Geron issued a press release entitled "Geron Announces FDA Approval of RYTELO™ (imetelstat), a First-in-Class Telomerase Inhibitor, for the Treatment of Adult Patients with Lower-Risk MDS with Transfusion-Dependent Anemia."　The press release stated, in relevant part:

"***With the approval and availability of RYTELO, we believe eligible patients with lower-risk MDS can potentially experience meaningful clinical benefit, particularly the potential for greater than 24 weeks of freedom from the burden of red blood cell transfusions and symptomatic anemia***," said [Defendant] Scarlett[.] "***The approval of RYTELO as the first telomerase inhibitor is a testament to the power of our science and the passion of our people to innovate in the field of blood cancer***. As we celebrate today's momentous milestone, I would like to thank the patients and families, advocates, clinicians, study coordinators and site personnel, scientists, and Geron employees and collaborators past and present whose participation was integral to this achievement and to supporting our transformation into a commercial company."

\*\*\*

IMPORTANT SAFETY INFORMATION

WARNINGS AND PRECAUTIONS

Thrombocytopenia

RYTELO can cause thrombocytopenia based on laboratory values. In the clinical trial, new or worsening Grade 3 or 4 decreased platelets occurred in 65% of patients with MDS treated with RYTELO.

Monitor patients with thrombocytopenia for bleeding. ***Monitor complete blood cell counts prior to initiation of RYTELO, weekly for the first two cycles, prior to each cycle thereafter, and as clinically indicated***. Administer platelet transfusions as

12

appropriate. Delay the next cycle and resume at the same or reduced dose, or discontinue as recommended.

Neutropenia

RYTELO can cause neutropenia based on laboratory values. In the clinical trial, new or worsening Grade 3 or 4 decreased neutrophils occurred in 72% of patients with MDS treated with RYTELO.

Monitor patients with Grade 3 or 4 neutropenia for infections, including sepsis. ***Monitor complete blood cell counts prior to initiation of RYTELO, weekly for the first two cycles, prior to each cycle thereafter, and as clinically indicated***. Administer growth factors and anti-infective therapies for treatment or prophylaxis as appropriate. Delay the next cycle and resume at the same or reduced dose, or discontinue as recommended.

38.     On June 7, 2024, Geron conducted a special investor call to announce the FDA's approval of RYTELO (the "FDA Announcement Call"). During the Q&A portion of the FDA Announcement Call, when asked to discuss RYTELO's weekly monitoring requirements Defendant Feller characterized them as "standard" and Defendant Kapur stated that neither community nor academic facilities consider such monitoring requirements to be a burden.

39.     On August 8, 2024, Geron issued a press release announcing the Company's Q2 2024 financial results. The press release stated, in relevant part:

"We are thrilled to have begun the launch of RYTELO, our first commercial product, in June, and are encouraged by the early success we are seeing and the reception from the medical community over these first six weeks," said [Defendant] Scarlett[.] "Our field teams have mobilized efficiently and have already interacted with approximately 60% of our top decile 1-4 accounts across the community and academic settings. This has contributed to gratifying uptake – as of July 31, 2024, we estimate that approximately 160 patients have received RYTELO, which is encouraging given the very early stage of this launch. Further, the MDS NCCN Guidelines, which guide clinical decision-making, prescriber behavior and reimbursement decisions, were updated at the end of July to include RYTELO as a Category 1 and 2A treatment of symptomatic anemia in patients with lower-risk MDS. With the introduction of RYTELO as a new therapeutic option, we are seeing increasing dialogue among hematologists rethinking treatment approaches for eligible patients with lower-risk MDS with transfusion-dependent anemia, regardless of ring sideroblast status, and we believe that RYTELO can become part of the standard-of-care for these patients."

40.     That same day, Geron hosted an earnings call with investors and analysts to discuss the Company's Q2 2024 results (the "Q2 2024 Earnings Call"). During the scripted portion of the Q2 2024 Earnings Call, Defendant Scarlett stated, in relevant part:

> **With our strong commercial infrastructure in place at launch and the efficient mobilization of our field teams, we've seen encouraging early launch results. As of July 31, 60% of the top decile 1-4 accounts had been reached by our team across both community and academic settings. This has led to gratifying uptake. We estimate, again, as of July 31, that approximately 160 patients have received RYTELO, which is quite encouraging given the very early stage of this launch**.

> The enthusiastic reception for RYTELO that we've seen within the hematology community reinforces the unmet needs for lower-risk MDS patients with symptomatic transfusion-dependent anemia. Many of our customers are passionate about getting access to RYTELO for their patients, and we've seen a strong push across the U.S. to add RYTELO to formularies, treatment pathways, and EMRs, including in the community setting.

41.     On November 7, 2024, Geron issued a press release announcing the Company's Q3 2024 financial results. The press release stated, in relevant part:

> "This has been a transformative year for Geron, following our first FDA approval and commercial launch of RYTELO in June. **The initial full quarter of product revenue from our U.S. launch exceeded our expectations and demonstrates strong execution as a commercial company. These results also reflect the high unmet need in lower-risk MDS and the compelling value proposition of RYTELO for hematologists and patients, giving us confidence in future continued demand and momentum for RYTELO**," said [Defendant] Scarlett[.] "We were also pleased to announce this morning the completion of important synthetic royalty and debt financing transactions with Royalty Pharma and Pharmakon Advisors. We believe that the favorable terms in these transactions reflect the significant commercial potential of RYTELO and provide us with critical flexibility to fuel continued growth and invest in our future."

> Recent Business Highlights

> - **Strong execution in the first full quarter of U.S. launch, with net product revenue for RYTELO (imetelstat) of $28.2 million in the third quarter of 2024**.

42.     That same day, Geron hosted an earnings call with investors and analysts to discuss the Company's Q3 2024 results (the "Q3 2024 Earnings Call"). During the scripted portion of the Q2 2024 Earnings Call, Defendant Scarlett stated, in relevant part:

14

Following FDA approval and the commercial launch of RYTELO, our first-in-class telomerase inhibitor, this has been a transformative year for Geron. ***As a result, we believe we're well-positioned to build long-term commercial value with this product***.

In our first full quarter on the market in the United States, we achieved $28.2 million in RYTELO net product revenue, which exceeded our expectations. ***The initial quarter of product revenue speaks to our execution as a commercial company, as well as the high unmet need in lower-risk MDS and the compelling value proposition of RYTELO for hematologists and patients. This gives us confidence in future continued demand and momentum for RYTELO***.

43.     Also during the scripted portion of the Q3 2024 Earnings Call, Defendant Ziegler stated, in relevant part:

In the first few months of launch, demand has increased month-over-month with Q3 performance exceeding our expectations. Demand from launch through Q3 has come from 388 ordering centers, which represents approximately 45% of our key targeted accounts. This strong start reinforces the high unmet need in RYTELO's clinical profile in first line ESA ineligible and second line plus lower risk MDS.

Our market research indicates treating physicians appreciate RYTELO's differentiated clinical profile in 24-week and one year red blood cell transfusion independent rates, median duration of red blood cell transfusion independence and hemoglobin rise. We believe RYTELO's strong clinical data support broad utilization across treatment eligible patient sub-groups in both community and academic settings.

\*\*\*

***From our own internal demand sales data, so far the RYTELO sales growth trajectory in the Q4 continues to be promising. Overall, we remain confident in our launch progress to date, continued demand for RYTELO, expected momentum into 2025 and the projected long-term growth of the brand***.

***Our number one commercial priority is to deliver a strong U.S. launch. We are committed to keeping laser focused on that objective. We plan to leverage our U.S. launch experience to also prepare for commercialization in select EU countries in 2026 and beyond***.

44.     The statements referenced in ¶¶ 28-43 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) despite contrary

15

representations to investors, a lack of awareness of RYTELO among health care providers, the weekly monitoring requirement, and seasonality and existing competition would impair Geron's ability to capitalize on the purportedly significant unmet need for the drug; (ii) accordingly, the RYTELO launch was unlikely to be as profitable as the Company had led investors to believe; (iii) as a result, Geron's business and/or financial prospects were overstated; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

45. In addition, Defendants violated Item 303 of SEC Regulation S-K, 17 C.F.R. § 229.303(b)(2)(ii) ("Item 303"), which required Geron to "[d]escribe any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." Defendants' failure to disclose that sales of RYTELO were stagnating over period of several months violated Item 303 because this issue represented a known trend or uncertainty that was likely to have a material unfavorable impact on Geron's business and financial results.

### **The Truth Emerges**

46. On February 26, 2025, Geron announced its financial results for the fourth quarter and full year 2024. The press release stated, in relevant part:

Net Loss

For the three and twelve months ended December 31, 2024, the Company reported a net loss of $25.4 million, *or $0.04 per share*, and $174.6 million, or $0.27 per share, respectively, compared to $52.0 million, or $0.09 per share, and $184.1 million, or $0.32 per share, respectively, for the three and twelve months ended December 31, 2023.

Revenues

Total product revenue, net for the three and twelve months ended December 31, 2024, was *$47.5 million* and $76.5 million, respectively. There was no product revenue in the prior year periods, given that RYTELO was approved by the FDA in June 2024.

16

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Total net revenue for the three and twelve months ended December 31, 2024, was ***$47.5 million*** and $77.0 million, respectively, compared to $23,000 and $237,000 for the same periods in 2023. Total net revenue includes license fees and royalties in addition to any product revenue, net. The increase in revenue is due to product revenue from U.S. sales of RYTELO, which was approved by the FDA in June 2024.

47.     That same day, Geron hosted the Q4 2024 Earnings Call.  During the scripted portion of the Q4 2024 Earnings Call, Defendant Scarlett stated, in relevant part:

From a financial perspective, we ended the year with a strong cash position of approximately $503 million, which we expect will enable us to reach profitability without additional financing, if our internal sales and operating expense expectations are met.

***However, despite achieving this revenue in the first two quarters of launch, we have observed flat revenue trends over the last few months***.

48.     Also during the scripted portion of the Q4 2024 Earnings Call, Defendant Ziegler stated, in relevant part:

As described previously by [Defendant Scarlett], we achieved $47.5 million in RYTELO net product revenues in the fourth quarter 2024. This demand for RYTELO was supported by strong payer access. Payers responsible for approximately 80% of the U.S. covered lives have implemented medical coverage policies for RYTELO, that are consistent with the FDA label, clinical trials and/or NCCN guidelines.

***New patient starts on duration of treatment are the key primary drivers of revenue***. For duration of treatment, it is important to note that even the longest treated patients in the commercial setting are just hitting the median of approximately eight months observed in the Phase 3 IMerge trial and our market research suggests the duration of treatment in commercial RYTELO patients treated to date appears consistent with that observed in IMerge.

***However, with respect to new patient starts, we have observed flatness over the past few months. Specifically, even though we see RYTELO utilized across RS-negative and RS-positive first line ESA ineligible, second line ESA relapse refractory and third-line plus patients. The majority of new patient starts have come from the third line plus patient segment with the second line new patient starts lower than our expectations***.

\*\*\*

We are also assessing other possible root causes for the flat revenue trends and have implemented or are in the process of implementing several changes such as scaling

up our analytics capabilities, refining our segmentation and targeting and improving our promotional and sales force effectiveness, which we believe will help us more fully capture the significant commercial opportunity for RYTELO in lower-risk MDS[.]

As shown on Slide 8 in our earnings deck, we estimate that in 2025, the U.S. RYTELO total addressable lower-risk MDS patient population is approximately 15,400 patients and includes patients recommended in the NCCN guidelines. This includes approximately 3,400 first line ESA ineligible patients, approximately 7,600 second line and 4,400 third line plus patients with approximately 75% of patients with RS negative and 25% of patients with RS positive status.

As I mentioned, our efforts are particularly focused on the eligible RS-negative population where RYTELO is the only drug approved for ESA relapsed/refractory patients. Assuming the duration of treatment observed in IMerge and based on the current net price, *there is potential to achieve blockbuster status by treating approximately 1/3 of the U.S. RYTELO, total addressable patients*.

49.     Further, during the Q&A portion of the Q4 2024 Earnings Call, when asked to discuss seasonality, Defendant Ziegler responded, in relevant part, "*we saw some seasonality beginning around the holidays* [. . . .] And there is some *hesitancy in the market to start some of these products that require, in our case, some monitoring*. So there was a little bit of a delay."

50.     Finally, when asked "in terms of new patient starts, are you mainly seeing prescribers who have already used RYTELO, kind of re-prescribe it to new patients?  Or is it mostly coming from new prescribers, new centers?", Defendant Ziegler responded, in relevant part, "[o]n new patient starts, we're seeing repeat prescriptions amongst the early adopters *largely at many of the academic medical centers. In the community, it's a little bit more diffused*."

51.     Market analysts were quick to comment on Geron's disappointing Q4 2024 results and emphasize the Company's failure to effectively market and commercialize RYTELO.  For example, on February 26, 2025, H.C. Wainwright published a report entitled "4Q24 Recap: Flat Revenues Hindering Launch and Delay in MF Interim Data; Downgrading to Neutral."  The H.C. Wainwright report stated, in relevant part:

**Flat revenue trend leads Geron to rethink launch strategy; we expect it may take time to build footing.** While the company's 4Q24 Rytelo revenues of $47.5M

18

were higher than our estimate of $45M, *the company has noted an 8-week and 4-week trend showing flat revenues since the holiday season*. The company announced a plan to shift its strategy, aimed at educating HCPs on Rytelo and expanding awareness of the therapy. The company noted that majority of new patient starts have been in 3L low risk myelodysplastic syndrome (LR-MDS) patients, *while the company's commercial plan is to target 1L ESA ineligible and 2L ESA refractory patients, as per the label. We note that 1L and 2L patients tend to have longer duration on therapy and are less pretreated, increasing potential for long term use.* To date, the observed duration of therapy has been consistent with the Phase 3 IMerge trial (8 cycles). *The company did not provide specific plans to address awareness aside from increased HCP education and use of KOLs and medical conferences*. In addition, the company noted plans for more investigator sponsored trials in 2025 to inform on sequencing and use in different lines of therapy. *The company has observed prescribers re-prescribing Rytelo to patients, though mostly in the academic setting and noted that in the community setting prescriptions have been more diffused*, though the company eventually expects breadth and depth of prescriptions to grow. In the 3Q24 earnings call, the company noted 65% of prescriptions are in the academic setting, which we expect is likely still the case. We remind that luspatercept was approved for 1L patients in 2023, which may be causing a shift in prescriber patterns and treatment paradigm. We believe some HCPs who are still using ESAs in 1L are likely then using luspatercept in 2L and then Rytelo in 3L. The company noted an increased effort to market use of Rytelo for 2L RS- patients which is a particular unmet need. Despite these efforts, we expect it may take several quarters in order to get a better understanding of launch trajectory and believe 2024 could have been impacted by upfront demand which may not be representative of a realistic growth rate for future quarters. As such, we have lowered our estimates for 2025 to $212M from $297M and lowered our peak sales to $1.5B from $2B. Our lower conviction in near-term revenue growth and decreased peak sales have led to our downgrade to Neutral.

52.    That same day, Barclays published a report lowering its stock price target from $9 to $4. The Barclays report stated, in relevant part:

We spoke to management. Slowdown seen over the last 2 months, correction in place. We update our model to reflect the slowdown, with potential revenue turnaround in 2025, but out of an abundance of caution we cut estimates and [price target] from $9 to $4. Next catalysts: revenues and EU approval.

We spoke to management. Our takeaways from Geron's 4Q24 earnings update:

- **Slowdown in sales growth expected in 1Q25**. Management noted Rytelo new patient start flatness over the past few months (specifically 4- and 8-week rolling averages), with *seasonality impact* that started around the Thanksgiving holidays in 2024, and *some hesitancy around starting products that require monitoring. Competitive dynamics also appear to be a headwind, and the majority of new starts are coming from the 3L+ LR-MDS setting, while second line starts have been lower than expectations*.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

53.    On this news, Geron's stock price fell $0.76 per share, or 32.06%, to close at $1.61 per share on February 26, 2025.

54.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## SCIENTER ALLEGATIONS

55.    During the Class Period, Defendants had both the motive and opportunity to commit fraud.  For example, during the Class Period, while disseminating the materially false and misleading statements alleged herein to maintain artificially inflated prices for Geron securities, several of the Individual Defendants enriched themselves by millions of dollars by engaging in insider sales of the Company's shares while those shares traded at artificially high prices. Specifically, during the Class Period, Defendant Grethlein sold approximately 674,348 shares of Geron stock for total proceeds of approximately $3.07 million, Defendant Feller sold approximately 287,900 shares of Geron stock for total proceeds of approximately $1.33 million, and Defendant Kapur sold approximately 421,875 shares of Geron stock for total proceeds of approximately $1.95 million.

56.    Defendants also had actual knowledge of the misleading nature of the statements they made, or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

57.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise

acquired Geron securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

58.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Geron securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Geron or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

59.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

60.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

61.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Geron;

- whether the Individual Defendants caused Geron to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Geron securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

62.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

63.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Geron securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold Geron securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

64.    Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

65.    Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **COUNT I**

### **(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

66.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

67.    This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

68.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Geron

securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire Geron securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

69.    Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Geron securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Geron's finances and business prospects.

70.    By virtue of their positions at Geron, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

71.    Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of Geron, the Individual Defendants had knowledge of the details of Geron's internal affairs.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

72.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Geron.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Geron's businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Geron securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Geron's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired Geron securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

73.     During the Class Period, Geron securities were traded on an active and efficient market.   Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Geron securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of Geron securities was substantially lower than the prices paid by Plaintiff and the other members of the Class.  The market price of Geron securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

74.    By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

75.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**(Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)**

76.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

77.    During the Class Period, the Individual Defendants participated in the operation and management of Geron, and conducted and participated, directly and indirectly, in the conduct of Geron's business affairs.  Because of their senior positions, they knew the adverse non-public information about Geron's misstatement of income and expenses and false financial statements.

78.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to Geron's financial condition and results of operations, and to correct promptly any public statements issued by Geron which had become materially false or misleading.

79.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Geron disseminated in the marketplace during the Class Period concerning Geron's results of operations.  Throughout the Class Period, the Individual Defendants exercised

their power and authority to cause Geron to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of Geron within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Geron securities.

80.    Each of the Individual Defendants, therefore, acted as a controlling person of Geron.  By reason of their senior management positions and/or being directors of Geron, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, Geron to engage in the unlawful acts and conduct complained of herein.  Each of the Individual Defendants exercised control over the general operations of Geron and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

81.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Geron.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS

Dated: March 14, 2025

Respectfully submitted,

POMERANTZ LLP

/s/ Jennifer Pafiti

Jennifer Pafiti (SBN 282790)
1100 Glendon Avenue, 15th Floor
Los Angeles, California 90024
Telephone: (310) 405-7190
jpafiti@pomlaw.com

POMERANTZ LLP
Jeremy A. Lieberman
(*pro hac vice* application forthcoming)
J. Alexander Hood II
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

*Attorneys for Plaintiff*

CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS